UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BAY CORRUGATED CONTAINER, INC.,

                    Plaintiff,                               Civil Action No. 91-CV-70170

vs.

                                              HON. BERNARD A. FRIEDMAN

GOULD, INC.,

                    Defendant.

_____/

## <u>OPINION AND ORDER OF DISMISSAL</u>

        This matter is presently before the Court following remand from the court of appeals.

*See Bay Corrugated Container, Inc. v. Gould, Inc.*, 462 F. App'x 516 (6th Cir. 2012).  The parties

having further briefed the issues, and the Court having had the opportunity to further review the

matter, the Court shall dismiss the complaint because plaintiff failed to prosecute its claim diligently

against defendant.

        The history of this case was summarized as follows in the Court's previous order of

dismissal:

>         This environmental contamination case has a long history.
> Plaintiff Bay Corrugated Container, Inc. ("Bay") purchased a
> manufacturing plant located in Monroe, Michigan ("the Monroe
> Facility") from defendant Gould, Inc. ("Gould") in 1973.  Gould had
> used this facility from 1952 to 1973 to manufacture batteries.  Since
> 1973, Bay has used it to manufacture corrugated cardboard.  In 1984,
> Gould sold its battery business to GNB Batteries, Inc. ("GNB").
>         In 1991 Bay brought the instant action against Gould, alleging
> that Gould was responsible for environmental contamination at the
> Monroe Facility stemming from Gould's battery manufacturing
> operations. Although GNB had purchased Gould's battery division
> in 1984, GNB denied liability for contamination and Gould defended
> the litigation. The litigation resulted in a 1994 Settlement Agreement
> and Mutual Release ("1994 Settlement Agreement") in which Gould
> and Gould Electronics, Inc., agreed to pay for investigation and
> remediation of the contaminated site.  The court incorporated the

terms of this settlement agreement into a consent judgment that was entered on August 2, 1994 [docket entry 91].

In November 1999, Bay filed a petition to enforce the consent judgment. Gould responded by filing a motion to dismiss. The court held a status conference in January 2000 and a hearing in February 2000. Instead of deciding either the petition or the motion to dismiss, the court appointed a mediator, Dean A. James Barnes, to assist in resolving the dispute. The court heard nothing whatsoever from either party for the next nine years. Now, out of the blue, plaintiff is again requesting that this court resolve its 1999 petition to enforce the 1994 consent judgment against defendant.

. . . From 1990 to 1995 Gould was involved in litigation with GNB regarding the liabilities assumed by GNB when it purchased Gould's battery division. In September 1995, that litigation came to a final conclusion when the Court of Appeals for the Seventh Circuit held that GNB assumed all of Gould's environmental liabilities when GNB purchased Gould's battery division. *See GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615 (7th Cir. 1995).FN2/

Documents attached to Gould's status report show that in 1996 and 1998, following the Seventh Circuit's unambiguous decision, Bay expressly acknowledged the transfer of liability under the 1994 Settlement Agreement from Gould to GNB by negotiating several modifications to that agreement *with GNB*. For example, in a letter dated August 29, 1996, to GNB's counsel, counsel for Bay agreed to amend the 1994 Settlement Agreement to extend the deadline *for GNB* to complete certain site work at the Monroe Facility. In a document entitled Investigation and Remediation Agreement Between GNB Technologies, Inc. ("GNB") and Bay Corrugated Container Corp. ("Bay"), dated July 7, 1998, a copy of which is attached to Gould's status report, GNB and Bay expressly acknowledged that "GNB has assumed Gould's responsibilities under the [1994] Settlement Agreement."

Bay's November 1999 petition "to enforce consent decree" sought to compel Gould to perform environmental site work at the Monroe Facility, despite the fact that Bay had already acknowledged, repeatedly in writing, that Gould's liability under the 1994 settlement agreement and consent decree was transferred to GNB upon GNB's purchase of Gould's battery division in 1984. Even in its 1999 petition, in footnote 1, Bay acknowledged that "GNB Technologies, Inc. is the successor in interest to Gould, Inc." It is not clear why Bay, in light of the Seventh Circuit's decision, looked to Gould in 1999 or why Bay is continuing to do so now.

In any event, on January 12, 2000, and February 16, 2000, this court held hearings regarding Bay's 1999 petition and Gould's

2

motion to dismiss. At oral argument, Bay recognized GNB as Gould's successor in interest. Nonetheless, Bay contended that Gould was responsible for additional investigation and remediation of the Monroe Facility. As noted above, the court referred the matter to Dean Barnes for mediation. During the mediation, Exide Technologies, Inc. ("Exide") purchased GNB and assumed GNB's environmental liabilities. On October 31, 2000, Bay and Exide entered into an Outline of Settlement Agreement ("2000 Settlement Agreement"), a copy of which is attached as Exhibit D to Bay's status report. In this agreement, Exide and Bay expressly indicated that the remaining environmental responsibilities at the Monroe Facility belong to Exide and that Bay held it exclusively responsible for any remaining investigation and remediation. The 2000 Settlement Agreement states: "Exide will have responsibility for contamination arising from contaminants identified to date." Bay's Status Report, Ex. D, p. 5. This document also states: "This agreement is binding among the parties and will be further evidenced and implemented pursuant to an Amended and Restated Consent Judgment and Settlement Agreement which the parties shall enter into as soon as possible. However, in the absence of such Amended and Restated Consent Judgment and Settlement Agreement, this outline shall be binding upon the parties." *Id.* at 6. This agreement was signed by Bay and Exide, although not reduced to a consent judgment. Interestingly, this agreement contains no enforcement provision other than ¶ 6, entitled "Mediation," which provides that "[i]f a dispute arises between the parties relating to this Agreement, Dean A. James Barnes will act as facilitator," suggesting that Bay waived any other remedies it might have had.

The situation took a new turn on April 15, 2002, when Exide filed a Chapter 11 petition with the United States Bankruptcy Court in Delaware (Case No. 02-11125). While attempting to reorganize in bankruptcy, Exide filed a motion to reject the 1994 and 2000 Settlement Agreements pursuant to section 365 of the Bankruptcy Code, a provision that allows a debtor to reject executory contracts with court approval. In November 2002 the bankruptcy court denied the motion to reject the 1994 Settlement Agreement. (Apparently the motion to reject the 2000 Settlement Agreement remains pending.) Liability under the 1994 settlement agreement therefore continues to attach exclusively to Exide.

In its "Notice Requesting Resolution of Petition to Enforce Consent Judgment," Bay now requests that the court convene a conference "for the purpose of establishing a Scheduling Order for the Court to resolve Bay's Petition to Enforce the Consent Judgment dated November 30, 1999." Gould opposes this notice/request on

3

various grounds, including that it has no liability.

_____

FN2/

In *GNB Battery Techs.*, GNB sought a declaration that it was not liable for environmental contamination caused by Gould prior to GNB's purchase of Gould's battery division. Gould counterclaimed for the opposite declaration. The Seventh Circuit affirmed the district court's decision that the parties' "Assumption Agreement unambiguously transferred the disputed environmental liabilities to GNB" and that GNB had assumed "*all of Gould's liability arising out of its earlier dumping and storage of toxic waste*." *Id.* at 619 (emphasis added). The Seventh Circuit noted that the parties' Assumption Agreement "contemplated the transfer of all of Gould's liabilities whether they were known or not, and whether they had been identified and responded to or not." *Id.* at 623. The district court's specific findings and conclusion, which the Seventh Circuit affirmed, were as follows:

> The Court finds that under the restated assumption agreement GNB, Inc. assumed the liability for toxic waste generated by Gould from its battery business and stored at third-party dump or storage sites or at Gould closed plants prior to the divestiture and sale. Judgment is returned for Defendant Gould, Inc. and against Plaintiffs GNB, Inc. and GNB Industrial Battery Company.

*GNB, Inc. v. Gould, Inc.*, 1994 WL 110210, at *8 (N.D. Ill. March 25, 1994).

Opinion and Order of Dismissal [docket entry 124] at 2-6 (some footnotes omitted).

The Court denied plaintiff's "notice requesting resolution of petition to enforce consent judgment" and granted defendant's motion to dismiss, finding that defendant no longer had any liability to plaintiff (based on the fact that liability for any environmental contamination at the Monroe Facility attributable to defendant's battery manufacturing operations was transferred to GNB and then Exide) and that in any event dismissal was appropriate under Fed. R. Civ. P. 41(b) due to the fact that, even assuming defendant's liability had not been transferred to GNB and Exide,

4

plaintiff had taken no action to prosecute its claim against defendant for a period of many years. In reversing, the court of appeals found that "Gould, Inc.'s continued liability to Bay depends upon whether there has been a novation that substituted Gould, Inc.'s liability with that of GNB or Exide." *Bay Corrugated*, 462 F. App'x at 517. The court of appeals remanded for further proceedings as to the issues of "whether there has been a novation and whether, as the district court determined, Gould, Inc. is no longer liable to Bay" and whether dismissal for lack of prosecution is appropriate. Following remand, the parties supplemented the record with affidavits and additional documents.

Addressing these issues in reverse order, the Court remains convinced that dismissal of this matter for plaintiff's lack of prosecution is indeed appropriate. Dismissal for lack of prosecution is authorized both under Fed. R. Civ. P. 41(b) and as a matter of the court's inherent authority. In *Link v. Wabash R.R. Co.*, 370 U.S. 626, 629 (1962), the Supreme Court noted that "[t]he authority of a federal trial court to dismiss a plaintiff's action with prejudice because of his failure to prosecute cannot seriously be doubted." The Court indicated that "[t]he power to invoke this sanction is necessary in order to prevent undue delays in the disposition of pending cases and to avoid congestion in the calendars of the District Courts." *Id.* at 629-30. The Court recognized "the power of courts, acting on their own initiative, to clear their calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." *Id.* at 630. In that case, the district court sua sponte dismissed the complaint with prejudice for lack of prosecution when plaintiff's counsel failed to appear for a pretrial conference. In affirming, the Supreme Court found the district court had reasonably inferred that plaintiff "had been deliberately proceeding in dilatory fashion" in light of counsel's failure to attend the conference (although he telephoned chambers the day of the conference and requested that it be postponed one or two days)

5

and "the drawn-out history of the litigation." *Id.* at 633. The "drawn-out history," which lasted approximately three and one-half years, primarily consisted of plaintiff once obtaining an adjournment of the trial date, plaintiff once acquiescing in defendant's request for an adjournment of the trial date, and plaintiff failing for 19 months to answer interrogatories and finally doing so the day before a hearing was to be held on a show cause order. *See id.* at 628 n.2 & 635 n.11. The Supreme Court found no error in the district court's failure to warn plaintiff about the possibility of dismissal or its decision to dismiss the complaint without a hearing. *See id.* at 632.

In the years since *Wabash* was decided, the Sixth Circuit has held that a district court must consider various factors when deciding whether to dismiss a complaint for lack of prosecution. Recently, in *Carpenter v. City of Flint*, 723 F.3d 700, 704 (6th Cir. 2013), the court of appeals stated:

> It is well settled that a district court has the authority to dismiss sua sponte a lawsuit for failure to prosecute. *See, e.g., Link v. Wabash R.R. Co.*, 370 U.S. 626, 629–30, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *Carter v. City of Memphis*, 636 F.2d 159, 161 (6th Cir.1980). Nonetheless, "[t]he dismissal of a claim for failure to prosecute is a harsh sanction which the court should order only in extreme situations showing a clear record of contumacious conduct by the plaintiff." *Wu*, 420 F.3d at 643 (internal quotation marks omitted). In *Link*, the Supreme Court stated that there was "no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client." *Link*, 370 U.S. at 633, 82 S.Ct. 1386. Although this principle—that generally it is not unduly unfair to punish a client for his counsel's errors—remains valid, "we have increasingly emphasized directly sanctioning the delinquent lawyer rather than an innocent client." *Coleman v. Am. Red Cross*, 23 F.3d 1091, 1095 (6th Cir.1994); see *Mulbah v. Detroit Bd. of Educ.*, 261 F.3d 586, 590 (6th Cir.2001) ("[T]his Court has expressed an extreme reluctance to uphold the dismissal of a case merely to discipline a party's attorney."). This is because dismissing a plaintiff's case with prejudice "deprives a plaintiff of his day in court due to the inept actions of his counsel." *Patterson v. Twp. of Grand Blanc*, 760 F.2d 686, 688 (6th Cir.1985). Accordingly, "[d]ismissal is usually inappropriate where the neglect is solely the fault of the attorney."

6

*Carter*, 636 F.2d at 161.

Under this court's precedent, we consider four factors when determining whether dismissal for failure to prosecute was within the district court's discretion:

> (1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal of the action.

*Mulbah*, 261 F.3d at 589.

Under the first factor, "[t]he plaintiff's conduct must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of [his] conduct on those proceedings." *Carpenter*, 723 F.3d at 705 (citations and internal quotations omitted). *See also Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 739 (6th Cir. 2008) (finding the first factor met where plaintiff "was at best extremely dilatory in not pursuing his claim, which indicates an intention to let his case lapse"). Prejudice is shown "if the defendant is required to waste time, money, and effort in pursuit of cooperation which [the plaintiff] was legally obligated to provide," *id.* at 707 (citation and internal quotation omitted), and "prejudice may be presumed from an unreasonable delay." *Richter v. Am. Aggregates Corp.*, 522 F. App'x 253, 259 (6th Cir. 2013). The third factor, by its terms, applies where plaintiff has "fail[ed] to cooperate" in moving the case along. And the fourth factor applies when an "alternative sanction would protect the integrity of the pretrial process." *Carpenter*, 723 F.3d at 709 (citations and international quotations omitted). "While none of these factors is dispositive, a case may be dismissed by a district court where there is a clear record of delay or contumacious conduct on the part of the plaintiff." *Mulbah v. Detroit Bd. of Educ.*, 261 F.3d 586,

7

591 (6th Cir. 2001). *See also Knoll v. Am. Tel. & Tel. Co.*, 176 F.3d 359, 365 (6th Cir. 1999) ("Although review of a Rule 41(b) dismissal typically involves consideration of the remaining three factors cited earlier, their importance fades in the face of the conclusion that dismissal was warranted by contumacious conduct.").

In the present case, dismissal for lack of prosecution is clearly warranted. As noted above, the Court entered a consent judgment in July 1994 and Gould, despite its belief that GNB was solely responsible for all cleanup costs, began to carry out its obligations under the consent judgment. Approximately 14 months later, however, the Seventh Circuit issued its decision in *GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615 (7th Cir. 1995), affirming the district court's finding that Gould had transferred all of its environmental liabilities to GNB, which had assumed those liabilities as part of its purchase of Gould's battery manufacturing business. From 1996 to November 1999, when Bay filed its "petition to enforce consent judgment," Bay acknowledged this transfer of liability. For example, in July 1998 GNB and Bay (but not Gould) executed an "Investigation and Remediation Agreement" in which they both acknowledged that "GNB has assumed Gould's responsibilities under the Settlement Agreement," i.e., the 1994 settlement agreement between Bay and Gould which underlay the 1994 consent judgment entered in this matter; and that "the Settlement Agreement shall continue to govern [GNB's and Bay's] respective rights and obligations . . ." The July 1998 Investigation and Remediation Agreement required GNB (but not Gould) to carry out the soils investigation work these parties referred to as Task I. *See* Pl.'s Mot. for Reh'g or Recon., Ex. E [docket entry 126]. In August 1998, GNB and Bay (but not Gould) executed another "Investigation and Remediation Agreement," again acknowledging that GNB had assumed Gould's responsibilities under the 1994 settlement agreement, and requiring Bay (but not

Gould) to perform certain remediation work these parties referred to as Task II. *See id.* Ex. F. From 1994 to 1999, Bay took no action against either GNB or Gould in this Court to enforce its rights under the 1994 settlement agreement and consent judgment.

In November 1999 plaintiff filed a petition in this Court to enforce the 1994 consent judgment against Gould, as a dispute had arisen as to the scope of work required of Gould or GNB. In February 2000 the Court referred to matter to Dean Barnes for mediation. In October 2000, the mediation efforts eventually resulted in an Outline of Settlement Agreement between Bay and GNB's successor, Exide Technologies, Inc. *See* Pl's Br. on Remand [docket entry 149], Ex. A-6. Although Gould had participated in the mediation sessions, this settlement agreement[1] does not mention Gould; nor did Gould sign it. The essence of the agreement was that Exide would investigate contamination in accordance with an attached work plan and as required by the Michigan Department of Environmental Quality ("MDEQ"); that Exide would remediate the property as required by the MDEQ; and that any disputes under the agreement would be facilitated by Dean Barnes. From January 2001 until April 2002, counsel for Bay and counsel for Exide (who also represented Gould) exchanged letter, emails and more detailed drafts of a settlement agreement based on the October 2000 Outline. *See* Pl's Br. on Remand [docket entry 149], Ex. A-9 - A-21. Among other things, the attorneys could not agree on whether Gould was a party to the October

---

[1] Paragraph 8 of the Outline of Settlement Agreement states:

> Documentation: This agreement is binding among the parties and will be further evidenced and implemented pursuant to an Amended and restated Consent Judgment and Settlement Agreement which the parties shall enter into as soon as possible. However, in the absence of such Amended and Restated Consent Judgment and Settlement Agreement, this Outline shall be binding upon the parties.

9

2000 agreement.  As a result, the only memorialization of that agreement is the Outline.

In April 2002, Exide filed for bankruptcy.  *See id.* Ex. A-23.  In August 2002, Gould formally informed Dean Barnes and Bay of Gould's position that "Gould is not liable to BCC [Bay Corrugated Container, Inc.] with respect to further response actions at BCC's Monroe, Michigan facility because BCC's course of conduct over the past six years – dealing exclusively with GNB and Exide – effected a substitution of GNB (and later Exide) for Gould under the 1994 Settlement Agreement as a matter of Michigan law."  *Id.* Ex. A-26 at 1.  In its response to Dean Barnes and Gould, Bay stated its position that "the mere fact that BCC also dealt with GNB and Exide for six years regarding the liability for environmental clean-up activities at BCC's Monroe, Michigan plant does *not* release Gould from its obligations of liability under the original contract/Settlement Agreement."  *Id.* Ex. A-27 at 2-3 (emphasis in original).  Bay and Gould, without success, met again with Dean Barnes in late August 2002 in an attempt to resolve the substitution/novation issue.  *See id.* Ex. 28.

Over the next six and one-half years Bay took no action in this Court to enforce its rights against Gould.[2]  Instead, Bay filed proofs of claim against Exide in the bankruptcy matter, *see*

_____

[2] Bay's lead counsel from 2002 to 2008, Randall Vickery, indicates that from September 2002 to January 2006 he "was in regular communication with John Rego [Gould's counsel] discussing various settlement alternatives and attempting to negotiate a resolution of the Bay/Gould Settlement Agreement and Consent Judgment with the additional agreement of Exide in the Outline of Settlement."  Bay's Br. on Remand [docket entry 149], Ex. B ¶ 30.  According to Vickery's summary of the communications that occurred from September 2002 to August 2003, he was in contact with Rego, in writing and by telephone, regarding "settlement alternatives," including seeking insurance coverage.  In June-August 2003, Bay and Gould exchanged and discussed settlement proposals. In August 2003 Vickery "participate[d] in phone conferences with John Rego regarding Gould interest in finality in terms of on-site cleanup and clarification on indemnification issues."  Apparently there was no communication between Bay and Gould from September 2003 to January 2005, but in January 2005 Vickery "[r]eview[ed] written settlement proposal from John Rego on behalf of Gould."  In July 2005 Vickery

*id.* Ex. A-30 - A-32, and "judged it best to await the resolution of its proof of claim in the Exide bankruptcy rather than seeking yet again this Court's or the mediator's intervention." Pl.'s Br. on Remand at 5. In March 2009 – more than *nine years* since last appearing in this Court in February 2000 – Bay filed a notice [docket entry 118] requesting that the Court decide its November 1999 petition to enforce the 1994 settlement agreement and consent judgment.

   This history clearly shows that Bay took no action to prosecute its claim against Gould for an inexcusably long period of time. After settling its claim against Gould and obtaining a consent judgment in July 1994, Bay took no action against Gould in this Court until November 1999 (a hiatus of five and one-third years), when it filed a petition to enforce the consent judgment. Thereafter, following referral of the matter to mediation, Bay took no action against Gould in this Court until March 2009 (an additional hiatus of nine and one-third years), when it filed a notice requesting a ruling on its November 1999 petition.[3] Certainly, after filing this petition Bay was entitled to suspend its litigation efforts for a reasonable period of time while it pursued settlement discussions. But in this case those discussions, according to Bay, lasted nearly six years (from approximately February 2000 until January 2006), during which time Bay did not communicate with

---

"[r]eviewed settlement proposal to Gould," and in December 2005 and January 2006 Vickery and Rego had some additional communication regarding settlement. *Id.* Vickery's affidavit shows no further communications between Bay and Gould after January 2006. Thereafter, "Bay continued to monitor the Exide Bankruptcy and evaluate potential options to resolve its dispute with Gould." *Id.* ¶ 35.

 [3] At the status conference convened by the Court on August 5, 2009, plaintiff's counsel conceded that from "2002 and 2003 and the end of 2008 which is approximately a six-year period, nothing really happened other than getting the proofs of claim filed in the bankruptcy court," and that Bay took no action against Gould until it filed its notice in March 2009 to resolve the November 1999 petition. Gould's Reply Br. [docket entry 151], Ex. 4 at 8. During these years, Bay's counsel conceded the case was "really way off your radar screen for so many years." *Id.*

the Court or signal any intention to enforce the 1994 consent judgment. Even after its informal settlement negotiations with Gould finally ended in January 2006, Bay waited another three years and two months before returning to this Court and attempting to resuscitate its claim. This exceptionally long period of inactivity cannot be excused on the grounds that settlement negotiations were ongoing, as they simply dragged on too long[4] and, in any event, ended years before Bay finally returned to this Court. Nor can the years of inactivity be excused on the grounds that Bay made a "strategic decision" to observe the Exide bankruptcy (from 2002 to 2009), waiting to see what, if any, relief it might obtain from the claims it had submitted in 2003 in that case. Bay was certainly free to pursue any strategy it wished, but this particular strategy came at the cost of forfeiting its right to pursue Gould. Nothing prevented Bay from returning to this Court to prosecute its claim against Gould once the mediation failed to bear fruit, while simultaneously advancing its claims in the bankruptcy court. The first factor under *Carpenter* – fault – is established beyond any possible doubt.

The second factor – prejudice to defendant – is also manifest. As noted above, delay is presumptively prejudicial, and in this case the delay was truly extreme. The environmental contamination at issue in this case, for which plaintiff seeks to hold Gould accountable, occurred during the 20-year period before Bay purchased the Monroe property from Gould in 1973. Bay obtained a consent judgment against Gould in 1994 and sought enforcement of the consent judgment in 1999, but then allowed the case to languish until 2009. Bay's reasons for doing so are noted

---

[4] Bay offers no convincing explanation as to why it did not promptly return to this Court to prosecute its claim against Gould in 2002 once Gould disavowed any further liability under the 1994 settlement agreement. *See* Bay's Br. on Remand, Ex. B-21. As noted above, Bay's only explanation is that it had informal settlement discussions with Gould until early 2006 and that it chose to observe the Exide bankruptcy while pondering its options as to Gould.

above, but the inescapable fact remains that Bay allowed the case to lie dormant for years while witnesses died, memories faded, and the condition of the property changed. Gould notes that four witnesses with knowledge of waste disposal at the site died (in 2001, 2003 and 2008) while Bay took no action against Gould in Court and while Bay simply observed the Exide bankruptcy. *See* Gould's Reply Br. [docket entry 151] at 8-9. This prejudice cannot be cured.

Bay concedes that the third *Carpenter* factor – notice – does not apply. *See* Bay's Br. on Remand at 16. As for the fourth factor, there has been far too much water under the bridge for sanctions less drastic than dismissal to do any good. Bay does not suggest any such lesser sanctions, *see id.* at 17, and none which can undo Bay's years of inactivity and the resulting prejudice to Gould

exist.

The Court shall not dismiss the complaint on the alternative grounds of novation. As noted by the court of appeals, "[u]nder Michigan law, '[t]he elements of a novation require the creditor's intention both that the new debtor assume the obligation and that the old debtor be released.'" *Bay Corrugated Container,* 462 F. App'x at 517, *quoting Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 622 (6th Cir. 2001). "There must be consent by the creditor to take the new debtor as his sole security and to extinguish the claim against the former." *Harrington-Wiard Co. v. Blomstrom Mfg. Co.*, 166 Mich. 276, 288 (1911). From the documents submitted by the parties, it is not clear that Bay expressly intended to release Gould. Bay's drafts of the settlement agreement, which sought to memorialize the agreement reached under Dean Barnes' supervision in 2000, show Bay's efforts to include Gould as a party to that agreement. *See, e.g.,* Bay's Br. on Remand, Ex. A-9, A-15. And, as noted, Bay continued negotiating with Gould until January 2006. Bay also

indicated on its proof of claims, filed in the bankruptcy court, that it was reserving its rights as to Gould. *See, e.g., id.* Ex. A-30. While Bay clearly allowed its claim against Gould to lapse by failing to prosecute it, the Court cannot conclude that Bay clearly expressed its intent to release Gould.

For the reasons stated above,

IT IS ORDERED that Bay's "notice requesting resolution of petition" [docket entry 118] and its petition to enforce the 1994 consent judgment [docket entry 92] are denied due to Bay's lack of prosecution, but not on grounds of novation.

_s/ Bernard A. Friedman____
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE

Dated:  January 23, 2014
        Detroit, Michigan

14